**BALLESTER HERMANOS, INC., Plaintiff,**

v.

**CAMPBELL SOUP COMPANY, Defendant.**

**Civ. No. 92–1096 (JP).**

United States District Court, D. Puerto Rico.

Aug. 27, 1992.

Federico Calaf–Legrand, Reichard & Calaf, San Juan, P.R., for plaintiff.

Eric A. Tulla, Rivera, Tulla & Ferrer, Hato Rey, P.R., Edward Moss, Anderson, Moss, Parks, Russo & Cohen, P.A., Miami, Fla., for defendant.

## OPINION AND ORDER

PIERAS, District Judge.

The Court has before it plaintiff's Motion for Partial Summary Judgment dated July 16, 1992 (docket No. 50), along with defendant's Opposition dated August 11, 1992 (docket No. 66),[1] and defendant's Motion for Summary Judgment dated July 17, 1992 (docket No. 51), along with plaintiff's Opposition dated July 31, 1992 (docket No. 59). For the reasons set forth below, plaintiff's motion is hereby GRANTED and defendant's motion is hereby DENIED.

### I. Background

Plaintiff Ballester Hermanos, Inc. (hereinafter "BHI") is a corporation which operates from its own distribution center and warehouse located in Barrio Palmas, Cataño, Puerto Rico, and from satellite warehouses located in Ponce and Mayagüez, Puerto Rico. BHI is engaged primarily in the business of importing, distributing and selling food products and liquors. Defendant Campbell Soup Company ("CSC") is a New Jersey corporation which manufac-

tures canned, bottled and frozen food products, which it sells under various labels, including Campbell Soups, Franco–American, Pepperidge Farm and Vlasic.

In 1953, BHI began to distribute CSC's line of canned foods in Puerto Rico. Over time, CSC added new lines of products which BHI introduced into the Puerto Rican market. The parties entered into a series of agreements reflecting their relationship as it evolved. The principal agreements are summarized below. An Agreement dated December 1, 1953, authorized BHI to "solicit orders in Puerto Rico for CSC products marketed under the Campbell, Franco–American and V–8 labels." The Agreement specifically stated that BHI was not to act as broker, sales agent, or distributor of any CSC products and was to receive a five percent commission on any sales it arranged.

A Sales and Distributing Agent Agreement dated October 21, 1966 ("SDAA"), established BHI as CSC's "exclusive agent to solicit orders in Puerto Rico for Campbell Products" (SDAA § I.A.) and as its "exclusive agent to arrange delivery for all Campbell products ordered for delivery by [CSC] in Puerto Rico" (SDAA § II.A.). The arrangement empowered BHI to solicit orders subject to prices and terms of sale set by CSC and subject to acceptance or rejection by CSC. SDAA § I.B. BHI was to assist CSC in billing and submit bimonthly billing reports. *Id.* BHI was to use its best efforts to promote the sale of CSC products in Puerto Rico, through merchandising and promotions. SDAA § I.C. For each sale, BHI received a sales commission of five percent. SDAA § I.D. By a separate agreement, BHI leased to CSC space in its warehouses for the storage of CSC's products. CSC bore the risk of loss for damages suffered by the goods prior to delivery to the customers, until which time the goods remained the property of CSC. SDAA § II.C. On November 30, 1966, CSC assigned its benefits, duties and obligations under the Agreement to one of its subsidiaries, Campbell Soup Inter–America, Inc.

1. Plaintiff's Motion (docket No. 68) to have its Statement of Uncontested Facts deemed admitted based on the tardiness of defendant's Opposition is hereby DENIED.

("CSIA"). The agreement thereafter operated essentially unchanged for ten years.[2]

On December 8, 1976, BHI and CSIA made certain amendments to the Agreement, including primarily a separate recital of commissions regarding CSC's Pepperidge Farm products. This Revised Sales and Distributing Agent Agreement ("RSDAA") stated explicitly that its purpose was merely to "restate" the earlier Agreement while incorporating the various amendments. Most of the incorporated changes were quantitative—*e.g.*, extending the arrangement to include additional products, an additional territory, and an increased (7%) commission on Pepperidge Farm products. A qualitative change was made in that BHI assumed the risk of loss for damage to products sustained while in BHI's warehouses or while in transit under BHI's control. RSDAA § II.C.

On February 2, 1989, CSC wrote to BHI to inform of its "intention to eliminate Campbell's Soup Inter–America, Inc. and return to a buy-sell relationship with Ballester." On May 30, 1989, BHI and CSC executed a Distribution Agreement ("DA"), which reflected the elimination of CSIA as well as other substantive changes in the relationship between the parties. The Agreement recites in its preamble that it reflects the fact that "the Company and the Distributor desire to continue, to reconfirm, and to update their existing relationship in a written agreement." It established BHI as CSC's "exclusive distributor" in Puerto Rico and the United States Virgin Islands. DA § 1. It provided that CSC would accept orders from BHI, who would purchase CSC's products at the then-official domestic list price. DA § 2. CSC would ship the goods to an East Coast or Gulf Coast port mutually agreed upon by the parties. *Id.* BHI would receive the goods at that port and from that point would take title to the goods and assume all risk of loss, costs of transportation and import duties. *Id.* CSC agreed not to encourage the competitive distribution or resale of its products by customers operating outside BHI's territory but took no responsibility for controlling such sales, for which BHI would receive no commission. DA § 4. BHI was to use its best efforts to promote, distribute, and sell CSC's products, which efforts were to include developing a marketing program, including advertisements and promotions, although such costs were to be borne by CSC. DA § 6. BHI undertook to act as an independent contractor and agreed that it would not "act or fail to act in any way which would tend to cause any third party to believe the Distributor to be the agent or representative of the Company for any purpose." DA § 12. BHI further agreed that its sole profit was to be "whatever profit [BHI] realize[d] on the resale of the Products purchased by it." DA § 14. The Agreement was for a term of one year to be automatically extended for periods of one year unless either party gave thirty (30) days prior written notice. DA § 16.

On January 21, 1992, CSC informed BHI in writing that it had decided to assume immediately the distribution of its products in Puerto Rico and the Virgin Islands through its affiliate Casera Foods, Inc. CSC stated that the change was "not taken lightly" and was made because of "demands placed on [CSC] by the marketplace and the economy." CSC asked BHI to pass on all orders and to return all undamaged inventory to Casera. CSC offered to pay BHI a five to six percent commission on all sales made by CSC in Puerto Rico through July 31, 1992, in consideration of an agreement to hold CSC harmless from any claims. BHI responded by filing its Verified Complaint in this case on January 24, 1992, seeking a Temporary Restraining Order, a Preliminary Injunction, and damages as provided by the Puerto Rico Dealers' Contracts Law, Law No. 75 of June 24, 1964, 10 L.P.R.A. 278, *et seq.* ("Law 75"). A Temporary Restraining Order was issued on January 27, 1992. A Hearing on plaintiff's Motion for a Preliminary Injunction was held on February 22, 1992, and result-

---

2. The Agreement was amended effective November 1, 1974, to extend its geographical scope to include the United States Virgin Islands and was further amended effective August 30, 1976, to extend BHI's services to cover certain frozen food products.

ed not in a ruling by the Court but in an agreement between the parties that the Distribution Agreement would remain in force. After some preliminary discovery, the parties filed the motions now before the Court.

## II. Discussion

Rule 56(c) of the Federal Rules of Civil Procedure provides for the entry of summary judgment in a case where the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that no genuine issue exists as to any material fact and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c); *Brennan v. Hendrigan*, 888 F.2d 189, 191 (1st Cir.1989); *Lipsett v. University of Puerto Rico*, 864 F.2d 881, 894 (1st Cir.1988). Summary judgment is appropriate where, after drawing all reasonable inferences in favor of the party against whom summary judgment is sought, there is not the slightest doubt as to whether a genuine issue of material fact exists. *Kennedy v. Josephthal & Co.*, 814 F.2d 798, 804 (1st Cir.1987); *Peckham v. Ronrico Corp.*, 171 F.2d 653 (1st Cir.1948).

Law 75, which regulates the termination of dealer's contracts, was passed to protect the interests of commercial distributors working in Puerto Rico. *Accord*

*Warner Lambert v. Superior Court*, 101 P.R.R. 535, 536. It provides:

> Notwithstanding the existence in a dealer's contract of a clause reserving to the parties the unilateral right to terminate the existing relationship, no principal or grantor may directly or indirectly perform any act detrimental to the established relationship or refuse to renew said contract on its normal expiration, except for just cause.

10 L.P.R.A. § 278a. As a result, "the practical effect of Act No. 75 is to extend the contract indefinitely, unless there is just cause for its termination or unless the principal is willing to pay damages." *Warner Lambert* at 556. The damages provided for by the Act are significant. A court seeking to calculate the damages suffered must take into account actual costs incurred by the dealer, the value of the good will of the dealer's business attributable to the terminated product lines, and the profit generated by the terminated lines over the last five years.[3]

In the seminal case of *Warner Lambert v. Superior Court, supra*, the Supreme Court of Puerto Rico held that the application of Law 75 to contracts entered into prior to its enactment in June 1964 was an unconstitutional violation of the guarantee against the impairment of obligations contained in Article II, Section 7, of the Puerto Rico Constitution. *Id.* at 561. The Court also ruled, however, that any agreement

---

**3.** Section 278b of the Act provides:

If no just cause exists for the termination of the dealer's contract for detriment to the established relationship, or for the refusal to renew same, the principal shall have executed a tortious act against the dealer and shall indemnify it to the extent of the damages caused him, the amount of such indemnity to be fixed on the basis of the following factors:

(a) the actual value of the amount expended by the dealer in the acquisition and fitting of premises, equipment, installations, furniture and utensils, to the extent that these are not easily and reasonably useful to any other activity in which the dealer is normally engaged;

(b) the costs of the goods, parts, pieces, accessories and utensils that the dealer may have in stock, and from whose sale or exploitation he is unable to benefit;

(c) the good will of the business, or such part thereof attributable to the distribution of

the merchandise or to the rendering of the pertinent services, said good will to be determined by taking into consideration the following factors:

(1) number of years the dealer has had charge of the distribution;

(2) actual volume of the distribution of the merchandise or the rendering of the pertinent services and the proportion it represents in the dealer's business;

(3) proportion of the Puerto Rican market said volume represents;

(4) and any other factor that may help establish equitably the amount of said good will;

(d) the amount of the profit obtained in the distribution of the merchandise or in the rendering of the services, as the case may be, during the last five years, or if less than five, five times the average of the annual profit obtained during the last years, whatever they may be.

that was extinctively novated after the enactment of Law 75 would fall within its protections. In later cases, the Court has recognized that since *Warner Lambert* the issue of novation has been revitalized so that "its efficacy as a method of extinguishment while at the same time a creator of obligations is claimed constantly under different assumptions of fact in almost all cases filed under [Law 75]." *Marina Industrial, Inc. v. Brown Boveri Corp.*, 114 P.R.R. 86, 91 (1983).

■ The law of Puerto Rico on novation is contained in Article 1158 of the Civil Code, which provides:

> In order that an obligation may be extinguished by another which substitutes it, it is necessary that it should be so expressly declared, or that the old and new be incompatible in all points.

31 L.P.R.A. § 3242. A novation may therefore occur in two different ways, both of which reflect the fact that a novation is never presumed. *Accord Francisco Garratón, Inc. v. Lanman & Kemp–Barclay & Co.*, 559 F.Supp. 405, 407 (D. Puerto Rico 1983). First, the parties may expressly state their will to novate, which must be established conclusively, without any trace of doubt. *Warner Lambert, supra,* at 544–45. The will of the parties to novate may be drawn directly from the superseding agreement or inferred from the surrounding circumstances. *Id.* at 544 (citing *Hernández v. Burgos*, 40 P.R.R. 440, 443 (1930)). If the parties expressly state their intent, extinctive novation may operate even if the only alteration of the agreement involves a simple modification of a secondary condition. *Id.* at 545 (citations omitted); *see also Marina Industrial, supra,* 114 P.R.R. at 100–103 (novation of dealership agreement existed even though agreements were practically identical because superseding agreement reflect at least some differences and provided that it should be viewed as "superseding and annulling any agreement heretofore entered into by and between the parties.")

Second, the parties may indicate their will to novate by entering into a superseding agreement that is "incompatible in all points" with its predecessor. The superseding agreement must reflect more than the modification of only one of the principal conditions of the contract. *Id.* It must reflect "such a radical change in the nature of the new obligation when compared with the old as to make them mutually excludable and unable to coexist." *Francisco Garratón, supra,* at 407 (citation omitted).

The particular facts of a case must be carefully examined to determine whether a novation occurred because the Civil Code provides that the termination of the preceding obligation carries with it the extinction of its guarantees and accessory rights. *Warner Lambert* at 547; P.R.Civ.Code Art. 1161, 31 L.P.R.A. § 3245. In *Warner Lambert,* the Court held that novation of an exclusive dealership agreement did *not* occur where the original agreement—which among other items included clauses establishing plaintiff as exclusive distributor, demarking the territory of the exclusive distributorship, prohibiting the distributor from selling similar products in competition, allowing the distributor to purchase inventory in the event of the cancellation of the contract, and setting the amount of the distributor's commission—was altered only to extent that the rate of commission was raised. The Court found that such a quantitative change, which left intact the essential structure of the parties' obligations, did not reflect the will to novate. *Id.* at 549. In *Marina Industrial, supra,* the Court found that an express novation could be effectuated where the new agreement reflected a change in the corporate entity named as distributor, included a clause prohibiting the distributor from doing business with clients of the principal within six months after the termination of the agreement, extended the territory to be served by the distributor, and reduced the term for notification of unilateral termination. The Court noted, however, that if the same facts had been analyzed in the context of a tacit novation "these changes by themselves would not be sufficient to produce an extinctive novation because they are not 'totally incompatible.'" *Id.* at 103. Finally, in *G. & J., Inc. v. Doré Rice Mill, Inc.,*

108 P.R.R. 89 (1978), the Court held that a novation of a distribution agreement had not occurred where the changes were again only quantitative, involving the expansion of the distribution to include addition types of products and additional territory and to increase the rate of commission. *Id.* at 96.

■ Although the parties have entered into several contracts since the enactment of Law 75, BHI's principal contention is that the 1989 Distribution Agreement operated as a tacit novation of the 1976 Revised Sales and Distributing Agent Agreement.[4] Defendant argues otherwise, suggesting that the language in the latter agreement regarding its purpose "to continue, to reconfirm, and to update" the existing relationship of the parties is an express statement of their will *not* to novate. Defendant further argues that the essential arrangement of the parties remained unchanged over the years: BHI maintained inventory, arranged for transportation, effected merchandizing and selling, handled customer complaints, effected collection efforts, and assisted in advertising—in essence, BHI worked to develop a clientele for CSC's products. *See San Juan Mercantile Corp. v. Canadian Transport Co., Ltd.,* 108 P.R.R. 218 (1978) (the essential role of a distributor is the creation of a favorable market and the conquest of a clientele). *But cf. Franceschini, Inc. v. Riley Co.,* 591 F.Supp. 414, 418 (D. Puerto Rico 1984) ("in order for one to be considered an Act 75 dealer one has to develop a market for a product or service through promotion and closing of sales contracts). CSC's assertions are not baseless. The cited language in the preamble of the Distribution Agreement does not indicate a will to novate. On the other hand, neither does it indicate an express will *not* to novate. As a result, the language does not preclude a finding of tacit novation.

The Court finds that the Distribution Agreement did operate as a tacit novation of the Revised Sales and Distributing Agent Agreement. The terms contained in the latter agreement which were incompatible with the former included wide-ranging clauses (i) establishing a buy-sell arrangement, rather than having BHI operate on a commission basis, (ii) allowing BHI to determine the price quoted to retailers rather than CSC, and (iii) providing that title over the goods would pass to BHI upon delivery so that BHI would bear the risk of loss and costs of transportation. These terms, as well as each of the others contained in the Agreement, reflect significant qualitative differences in the arrangement between the parties such that the relationship between BHI and CSC was changed utterly in 1989. As the Distribution Agreement itself establishes, BHI assumed the role of an independent contractor where it had previously acted as CSC's agent for sales and distribution. While BHI's ultimate aim continued to be to establish a clientele for CSC products within its territories and to achieve the highest possible volume of sales for the products, the arrangement chosen by the parties in 1989 to achieve this aim was wholly distinct in a business sense from the superseded arrangement. The fact that BHI was expressly forbidden , by the terms of the Distribution Agreement to present itself as CSC's agent reflects the unassailable fact that the new agreement was mutually exclusive of the Revised Sales and Distribution Agent

---

**4.** Plaintiff contends that the February 2, 1989, letter from CSC in which it announced its intention to "return to a buy-sell arrangement" constitutes a clear expression of the parties will that the Distribution Agreement would operate as arrangement entirely distinct from that embodied in the Revised Sales and Distributing Agent Agreement. The letter does not, however, constitute valid and admissible evidence. In matters of contract interpretation under the Puerto Rico Civil Code, as well as under Puerto Rico's parol evidence rule, *see* P.R.Laws Ann.Tit. 31, §§ 3471–79 and P.R.Laws Ann.Tit. 32, App. IV

R. 69, parties may resort to either contemporaneous of subsequent circumstances surrounding the document being interpreted to assist in the interpretation of an apparent conflict in the written text. *Francisco Garratón,* 559 F.Supp. at 407–08 (citing *Merle v. West Bend Co.,* 97 P.R.R. 392 (1969)). The February 2 letter, which *preceded* the March 30 Agreement, therefore cannot be used to shed light on the Agreement. No other evidence either within or extraneous to the February 2 Agreement indicates any express will of the parties to novate.

Agreement. *See Francisco Garratón, supra.*

## III. Conclusion

The 1989 Distribution Agreement operated as a novation of the prior agreement entered into by BHI and CSC; therefore, pursuant to controlling case law, BHI is entitled to the protections provided by Law 75. Plaintiff's Motion for Partial Summary Judgment is hereby GRANTED while Defendant's Motion for Summary Judgment is hereby DENIED.

IT IS SO ORDERED.